**UNITED CARBON CO. v. MONROE.**

Civ. A. No. 2946.

United States District Court
W. D. Louisiana, Monroe Division.

Sept. 15, 1950.

George M. Snellings, Jr., McHenry, Lamkin & Snellings, Monroe, La., for plaintiff.

Alden T. Shotwell, Shotwell & Brown, Monroe, La., for defendant.

DAWKINS, Chief Judge.

This case presents the matter of interpreting a contract, and the first question is·as to whether its provisions are clear and unmistakable, or whether their meaning is doubtful and ambiguous. Defendant gave notice of his intention to cancel it, and thereupon complainant brought this suit for an injunction against cancellation and to compel compliance with its terms as alleged in the petition. United Carbon Company (called United) is the assignee of an agreement between defendant Monroe, as seller, and Imperial Oil and Gas Products Company (called Imperial) as buyer, by which Monroe bound himself to make "available" to Imperial natural gas needed for consumption mainly at its carbon black plant, but for such other uses as the purchaser saw fit.

The contract in question was formally signed on November 24, 1947. The controversy here is as to whether the minimum quantity to be taken or paid for was

an *average* of not less than 5,000,000 cubic feet per day, as contended by plaintiff; or whether the latter was bound, subject to certain stipulations, to take or pay for that minimum every day, regardless of the total actually consumed in the course of the year, as claimed by the defendant.

Monroe owned mineral rights in certain leases in Union Parish, Louisiana, situated west of the Ouachita River, and Imperial owned and operated a carbon black plant in Ouachita Parish, east of that stream. The former agreed to drill and maintain on the leases wells sufficient to supply Imperial the stipulated minimum, while the latter undertook to construct a pipeline from its plant across said river, as well as a gathering system through which the gas could be taken at or near the mouth of the wells. The lands covered by the leases were described in an exhibit marked "A" attached and made a part of the contract. The effective date was December 1, 1947, and it was to "continue in full force and effect so long as seller is able to deliver gas from said leases or any of them, under the conditions specified in this agreement." (All emphasis throughout this opinion is by the writer.) The buyer was given the option, but not required, to connect with any well capable of producing less than 500,000 cubic feet per day, on condition that it give written notice of any intention not to so connect, in which event such well or wells would be released from the terms of the contract. As stated earlier, the seller was required to maintain the wells in a good working condition at its own expense at all times (Article II of the contract). The buyer, Imperial, agreed to *"operate"* them and to *"provide an operating superintendent in the field, who shall regulate the rate of production * * * at the direction of the Buyer to the end that Buyer's requirements from said wells may, at all times, be promptly met * * *."* If the seller failed to "maintain" the wells, buyer had its option, after giving fifteen days' notice, to "take over maintenance" at the expense of seller, and to reimburse itself from the proceeds of the gas, including a profit of 15% (Article III).

Article IV, being perhaps the most pertinent of the entire contract, is quoted in full:

"Seller agrees to sell and deliver and Buyer agrees to purchase and accept and to pay for whether taken or not a minimum of five million (5,000,000) cubic feet of gas per day provided, however, that if the failure of Buyer to accept up to the minimum of five million (5,000,000) cubic feet of gas per day as herein provided for, is due to the failure or inability of Seller to deliver said amount; then and in that event Buyer shall only be required to pay for the actual amount so delivered. Should the failure of Buyer to accept delivery of the minimum of five million (5,-000,000) cubic feet of gas per day be due to any other cause, the Buyer shall nevertheless pay for such minimum as though same had actually been delivered.

"Buyer may, at its option, take such additional amounts of gas daily in excess of the minimum of five million (5,000,000) cubic feet above provided which Seller has available for delivery from the lands and leases scheduled on Schedule 'A' and Seller hereby agrees to make available to Buyer such quantities in excess of five million (5,000,000) cubic feet of gas per day which is deliverable from said lands and leases.

"It is further agreed that Buyer will accept delivery of the minimum amount of gas which it is required to take under the terms and provisions hereof in equal daily quantities; it being understood, however, that due to operating conditions, it will be impossible to take the exact amount of such daily minimum quantity of gas each day, but that Buyer will each day accept delivery of a quantity of gas as near the daily amount it is required to accept as is possible under normal and proper operating conditions.

"Buyer may, at its option, but shall not be obligated to, install a compressing station or compressing stations in the field in order to completely deplete the wells from which gas is deliverable under the terms and provisions of this contract.

"Whenever the total amount of gas which can be delivered by Seller under

the terms and provisions of this contract declines to two and one-half million (2,-500,000) cubic feet of gas per day of twenty-four (24) hours, then, and in that event Buyer may, at its option, terminate this contract, such termination to be accomplished by written notice from Buyer to Seller not less than thirty (30) days before the effective date of such termination.

"Any portion or portions or all gas purchased by Buyer under the terms hereof may be used by Buyer for any purpose whatsoever, or may be resold by Buyer, all at Buyer's exclusive discretion."

The seller (Article V) *"dedicated"* to the fulfillment of the contract all lands described in said Exhibit "A" and agreed that during its existence he would not sell gas therefrom to anyone else. It was further provided that "whenever it" became "necessary in order to make delivery of the minimum of five million (5,000,000) cubic feet of gas per day," then at the request of the buyer seller would drill additional wells on the leased premises. If he failed when so requested in accordance with the agreement, the buyer was authorized "at its option" to do so, also at the expense of the seller, provided any such well drilled by the buyer "shall be a reasonably commercial producer for the Seller"; otherwise, the latter should not have to pay for it. Other terms and conditions, such as maximum cost of such drilling by the buyer, Imperial, were included. The drilling of additional wells was limited to the requirement of furnishing the minimum quantity of 5,000,000 cubic feet. In its concluding sentence, Article V recites: "All the terms and provisions of this contract shall be construed as being applicable to what is known as the Monroe Gas Sand, or any formation of a depth of not more than twenty-five hundred (2,500) feet."

The price was fixed in Article VI at three cents per thousand cubic feet, measured "at the well meter."

Article VII covers "Unit of Measurement," such as gravity, temperature, pressure, etc., all not important here, but a pertinent provision of this article is quoted as follows: "Buyer will install, operate and maintain at its expense orifice meters or other meters of standard style as it may be mutually agreed upon at the points of delivery established in Article II hereof, the registrations of which shall fix the total quantity of natural gas delivered by Seller to Buyer under this agreement, and shall be the exclusive method of measuring such natural gas except in the event of correction as in this article provided."

This article also provided that seller should have access "at all reasonable times" to the well meters, and that he might require that they be tested at the buyer's expense, not oftener than once every thirty days. Otherwise, there are lengthy provisions as to variations in percentages of accuracy, etc., and as to what should be done in event of substantial error. These, too, are not pertinent here. The last paragraph of this Article VII is quoted in full because of its bearing on the issues of the case, as follows: "All meter charts when removed from the meter or meters of Buyer or records of registration taken shall be forwarded to the office of Buyer for computation and check, whereupon Buyer, if and when requested by Seller, shall forward them within five (5) days to Seller for check and inspection. After making such check and inspection as desired, Seller shall, within a reasonable time, return said charts or records of registration to Buyer to be kept in permanent files and for the future reference of both parties."

Article VIII, dealing with time and method of payment, is also quoted in full, because of its pertinency:

"Statement and Payment

"For the purpose of this contract, a day shall consist of twenty-four (24) consecutive hours beginning at 7:00 o'clock A.M., and shall be dated as the calendar day in which said twenty-four (24) hour period begins, and a calendar month shall be deemed to begin on the first day of said month and to end at 7:00 o'clock A.M., on the first day of the succeeding calendar month.

"On or before the twentieth (20th) day of each calendar month Buyer shall ren-

der a statement to Seller showing the quantity of natural gas delivered during the preceding calendar month and shall accompany such statement with a remittance for the quantity of gas delivered during such calendar month, when computed at the rate and in the manner as elsewhere hereinabove provided. All such statements and remittances shall be deemed to have been properly made upon being deposited in the United States mail, postage prepaid, addressed to Seller at 401 North 7th Street, West Monroe, Louisiana. Each monthly remittance made by Buyer to Seller throughout each calendar year shall be for the actual amount of gas delivered during such preceding calendar month, except that, in the event it is necessary to make adjustment for gas which Buyer was required to take and did not actually so take during any calendar year, adjustment therefor shall be made in the remittance which becomes due on or before January 20th of each calendar year.

"Should the Buyer fail to pay any amount due on the 20th of each calendar month, as hereinabove provided, such payment shall become delinquent and interest thereon shall accrue at the rate of five (5%) per cent per annum from the due date. In the event that any payment continues in default more than thirty (30) days, Seller may, at its option, cancel and terminate this contract on thirty (30) days' written notice to Buyer of such termination."

Article IX is headed "Force Majeure," but because of its bearing upon other provisions of the contract is quoted in full, to wit: "When either party, without fault or negligence on its part, fails to perform any obligation hereunder assumed by it and such failure is due to acts of God or a public enemy, strikes, riots, injunctions or other breakage or accident to machinery, boilers, or lines of pipe and/or other apparatus or appliances, washouts, earthquakes, storms, floods, freezing of lines or wells, *sudden, partial or entire failure of gas wells or any cause beyond its control, whether of the kind mentioned or otherwise, or is caused by the necessity for making repairs or alterations in machin-ery, boilers, or lines of pipe, and/or other apparatus or appliances,* such a failure shall not be deemed to be a violation by either party of its obligations hereunder, but such party shall use due diligence again to put itself forthwith in position to carry out all of the obligations which by the terms hereof it has assumed; and each party shall give notice and full particulars of the cause of its failure to carry out its obligations hereunder, such notice to be in writing or by telegraph and given as soon as possible after the occurrence of the cause relied upon."

Articles X and XI deal with "Liability and Indemnity," "Warranty of Title and Tax," and are not believed pertinent to the issues here. No. XII provides the manner of giving notice of anything required by the contract, and Article XIII is the usual provision for assignment. The last Article, No. XIV, declares: "This agreement shall be construed in accordance with the laws of the State of Louisiana."

## Opinion

The court must first determine if there was ambiguity, in the light of the respective contentions.

Since the said leases were *dedicated to this contract,* it was evidently considered that Imperial would require for the operation of its carbon black plant, and such other purposes as might arise, not less than the 5,000,000 cubic feet per day which Monroe wished to sell, and that this would justify his assumption of the obligation to drill the wells necessary to produce it, including additional ones should those already drilled at any time prove insufficient to comply with the terms of the contract. On the other hand, if Imperial, for any reason, not confined to consumption of the carbon plant, wished, it might require all that the existing leases could produce, above the minimum.

Ordinarily, the motives which prompt the making of contracts, such as this, are the desires of each party to make a profit from his investment. Such quantities are then determined as are thought necessary to accomplish that result. In this case, if more than the minimums were consumed

at a profit, presumably both parties would benefit therefrom; whereas, if less were taken, and the purchaser had to pay for more than he consumed, the advantage would be that of the seller alone. A literal compliance, that is, had the buyer actually taken and paid for, say one billion cubic feet, at a rate less than 5,000,-000 feet per day, and at the end of the year had also paid for the deficiency of 825,000,000 cubic feet, or a total of 1,825,-000,000 cubic feet (365 X 5,000,000), as representing the daily shortages, it is believed this would have met the requirements of the contract according to the contention of either side. Monroe would have received the minimum consideration desired, and Imperial would have paid for what it has consumed, as well as the deficiencies.

 With this well understood motive of self-interest for making contracts in mind, let us analyze the language used to see whether, by giving the words their usual and ordinary meaning in the business or industry involved, the provisions are clearly susceptible of the interpretation contended for by either side. We start, of course, with the well recognized principle that forfeitures are not favored in either law or equity. The following is quoted from 17 Corpus Juris Secundum, Contracts, Page 742, Section 320, "—— Against Forfeiture":

"Forfeitures by implication or construction are not favored; and a construction entailing a forfeiture will not be given a contract unless no other construction is reasonably possible; where the contract is susceptible of two constructions, one of which will work a forfeiture and the other will not, that construction should be adopted which will prevent the forfeiture and preserve the rights of the parties, provided such construction is within the bounds of reason and fairness. The contract will not be construed to provide for a forfeiture unless it is clear, from the language thereof, that the parties intended so to provide; and even where there is a provision for a forfeiture, it will be strictly construed against the party who invokes it and for whose benefit it was inserted in

the contract, even though another provision to which the forfeiture provision is annexed may be liberally construed for the purpose of determining whether or not it imposes an obligation for the breach of which an action for damages may be brought. Certainly the court will not give a strained construction to a contract, or extend the plain and ordinary meaning of the words employed therein, for the purpose of establishing or supporting a forfeiture. A provision intended to prevent a forfeiture will, on the contrary, be upheld if possible.

"However, the rule of strict construction of a forfeiture provision, stated above, does not require the court to resort to a strained construction defeating the clearly expressed intention of the parties, nor does the court's abhorrence of forfeitures permit it to substitute a contract for the one entered into or to make another contract for the parties after a forfeiture has been declared in the manner prescribed by the contract."

See, also, Volume 5, Louisiana Digest, Contracts, ☞318, and cases cited.

 Yet, if there be no question about the meaning of what was said, each party must be held as he has bound himself, and the courts have no concern with good or bad bargains. Corpus Juris Secundum, Idem., page 743. However, the one claiming forfeiture carries a heavy burden of establishing his right thereto by clear and unmistakable proof. See the same authority, as well as cases cited in footnotes, Ibid., page 894, Section 407.

 Without finding it necessary to review the many decisions of the courts in Louisiana, as well as in other jurisdictions, it may be said, at least in contracts for primary exploration for minerals, such as oil and gas, where the purpose is to discover or to develop, in highly competitive circumstances, that *time is of the essence,* when time for drilling, etc., is stipulated. The court may also take notice of conditions in the Monroe Field, which were the common knowledge of those engaged in the gas industry, to the effect that it was proven territory, and in the particular area covered by this contract produc-

tion could be had simply by drilling at a rather uniform cost; in fact, the contract specifically refers to the "Monroe Gas Sand" as being about 2500 feet below the surface (Article V). As a matter of fact, such expenses were sufficiently established that the parties fixed a satisfactory maximum in the event Monroe failed and Imperial chose to drill additional wells as might be needed, at seller's cost (Article V).

Article IV, in its first clause, declares: "Seller agrees to sell and Buyer agrees to purchase and accept and pay for, whether taken or not, *a minimum of five million (5,000,000) cubic feet of gas per day.*" Does this necessarily have the same meaning as if it had said *for each and every day, regardless of how much is taken in the course of a year?* Or, would one experienced in the industry have understood that the quantity was to be measured *on the basis of not less than 5,000,000 cubic feet per day over the period of time at the end of which payment was required to be made for any deficiency?* There is no other provision for determining the quantity to be taken over the period of a year, at the end of which settlement was to be made for deficiencies. It is conceded that the buyer was required to pay on the twentieth of each month for all gas actually taken during the preceding *"calendar month"* (Article VIII), or pay 5% interest thereafter, with the right of the seller, upon giving written notice when the buyer had been in default thirty days, to terminate the contract. However, it is perfectly clear that this provision in Article VIII meant default in paying for what was *actually taken, and not for any deficiency below the minimum.*

We next find in the same first paragraph and sentence of Article IV the provision that if the "failure of the Buyer to accept up to the minimum of five million (5,000,-000) cubic feet * * * per day * * * is due to the failure or inability of Seller to deliver said amount, then * * * Buyer shall * * * pay for the actual amount so delivered." The second sentence of the first paragraph of Article IV recites, with respect to the daily take, that

if the failure of the buyer to accept up to the minimum of 5,000,000 cubic feet of gas per day *"be due to any other cause, the Buyer should nevertheless pay for such minimum as though same had actually been delivered."* It should be noted that, insofar as the seller was concerned, the shortage in delivery below 5,000,000 cubic feet might be due to simple *"failure,"* as well as "inability" to deliver said amount, in which event the buyer, as above stated, would have to pay only for what was actually delivered, even if over a period of one year, it amounted to less than 365 times 5,000,000 cubic feet. In the next to last paragraph of this same article, it was provided that if *"the total amount of gas which can be delivered by Seller * * * declines to two and one-half million (2,-500,000) cubic feet of gas per day of twenty-four (24) hours,"* then *"Buyer may, at its option, terminate this contract"* in the manner as could the seller if the buyer failed to take the minimum of 5,000,000 cubic feet. Of course, the buyer was given the option of drilling additional wells if the seller failed, but no right to cancel unless delivery fell below 2,500,000 feet.

In the second paragraph of Article IV, the buyer is given the option of taking *"such additional amounts of gas daily in excess of the minimum * * * which Seller has available"* from the leases in Schedule "A," and *"Seller hereby agrees to make available to Buyer such quantities in excess of five million (5,000,000) cubic feet of gas per day which is deliverable from said lands and leases."* On its face, this might imply that if the buyer's needs required 10,000,000 feet per day, the seller would have to drill such number of additional wells as were necessary to supply the excess. However, in Article V immediately following, the obligation to drill additional wells is limited to what is necessary in order to make delivery of *"the minimum per day"* on written request of the buyer.

The crucial provision, on the point of whether the contract, as a whole, is susceptible of interpretation on its face, without the aid of outside evidence, is found in the third paragraph of said Article IV,

quoted above, wherein it was stipulated that the "Buyer will accept delivery" of the minimum in *"equal daily quantities,"* *with the understanding, however, that "due* *to operating conditions, it will be impos-* *sible to take the exact amount of gas each* *day, but that Buyer will each day accept* *delivery of a quantity of gas as near the* *daily amount it is required to accept as is* *possible under normal and proper operat-* *ing conditions."*

What was meant by "normal and proper operating conditions"? If the term were applied to a single small operator, it might mean something different to what would be normal and proper in the case of a larger concern with numerous interrelated activities. In that event, that is, with respect to the smaller enterprise, normal operations might mean those which had normally prevailed at the making of the contract, or what would be expected of a well conducted business of the same nature and size; but even then, if, for some reason, such as a sudden cessation of demand or ability to sell production, it was found that such enterprise could not survive if required to take the minimum each day, thus piling up unsalable quantities, such as carbon black, to the point of economic exhaustion, could it be said, because the machinery still functioned, that this would constitute "normal and proper operating conditions" contemplated by the contract? As stated earlier, the contract was assignable without limit as to both parties, and if acquired by a larger organization whose operations were more complicated in the relationship of its various units, normalcy might have a meaning different from that of a small one. When purchasing or accepting assignment of such an agreement, one normally would look first to the point of whether the proposed seller could assign it, and having found that he could, the next inquiry would be as to whether he could supply the minimum stipulated, and finally, as to whether the proposed purchaser would be restricted to the "normal and proper operating conditions" of its assignor, or by those of its own business. If it had been the intention to require the taking of the minimum, regardless of con-

ditions, other than mechanical and functional failures, it would seem that this could have been expressed in language much more easily understood.

Keeping in mind the suggested controlling motives or reasons for making any contract, let us see what the possibilities would be if it developed that the assignee controlled surrounding leases so closely situated that, by intensive development, quantities of gas in disproportionate amounts, compared with the limit of 5,-000,000 cubic feet per day, from the Monroe leases, would be withdrawn, thereby draining seller's leases of an undue proportion of the gas (leaving out of consideration for the present any conservation control). Could it be said that such conduct on the part of the buyer would be proper and normal? Parenthetically, it cannot be overlooked that the Conservation Department of the State has the power to control the allowable consumption in any field which could, conceivably, reduce the quantity here stipulated and fix the reduced figure as the maximum, in which event other provisions of the contract would apply. But so far as this court knows, there is no exact rule to prevent an operator, within certain limits, from favoring one lease as against another. Such operation would certainly not be "normal and proper." In the present instance, however, the stipulated price of 3¢, when compared to present day figures, would probably be sufficient guarantee against such a practice.

Neither can we ignore the fact, which is common knowledge to all of those in the gas business, that several years ago, the carbon black industry was greatly curtailed in this state. As a result, only a small fraction of the gas is now made into carbon black, as compared to the enormous quantities and major portion of it consumed up to that time by such plants. Nor can it be overlooked that today the major markets for gas are the pipelines which are increasingly transporting and selling it all over the country.

This contract was to run so long as the leases produced the minimum quantities stipulated, and the seller naturally

expected the buyer to continue to take it whether converted into carbon black or sold in the markets mentioned. Therefore, we would scarcely be justified in saying that the "normal and proper operating conditions" meant only those surrounding a single carbon black plant. Had such been the intention, here again it would have been very easy to have stated it in unequivocal language. Not only was this not done, but it was expressly provided that the buyer might do what he pleased with the gas, to the fullest extent, so long as he took the minimum amount of 5,000,000 cubic feet per day. Therefore, it may be assumed that the conditions intended would be those of the particular buyer of the gas at the time any question arose about it. The court is aware of the contention by defendant heretofore discussed that the operating conditions were those affecting the wells and the physical or mechanical facilities of the buyer, without regard to the circumstances just mentioned. However, such contingencies are provided for expressly in Article IX quoted above. But under the well settled rule with regard to forfeitures, if the construction here suggested is reasonable, it is to be adopted in preference to one which would bring about such a forfeiture.

The seller naturally desired that his income from the gas should be apportioned as nearly equal as possible to each month of the year. Yet, the contract expressly postponed payment for deficiencies to the end of the year. This was bound to reduce that monthly income accordingly, unless the excess takings on other days in any particular month served to bring the monthly check up to what was desired. Defendant's argument that if the buyer took as little as 3,000,000 feet per day for the first half of the year, or none at all, and then attempted to make up the difference by taking up to 10,000,000 feet per day, the seller would be under no obligation to drill additional wells for that purpose, thereby making such an attempt impossible, appears to be a clear example of what *would not be* "normal and proper," unless the facts to support that course made it reasonably necessary. In such

event, the buyer would simply have to pay for the deficiencies at the end of the year, regardless of their size, and the failure to do so would not only inure to the seller's benefit by keeping his gas in the ground, but would give rise to the right to cancel the contract.

◼◼ *Without proof to the contrary, it may be assumed that business men are honest and serious in making their contracts, and that they do so with knowledge of the conditions affecting the particular business with which they deal.* The possible markets for natural gas in the Monroe Field were well known to those engaged in the business. Insofar as domestic consumption is concerned, the demand, as everyone knows, varies with the seasons, being much greater in winter than in summer. If "normal and proper operating conditions" in the summer compel a reduction in withdrawals from the source of supply, it would seem that where this condition made it "impossible to take the exact amount of such daily minimum quantity * * * each day * * * of a quantity of gas as near the daily amount * * * required * * * as is possible under normal and proper operating conditions," would mean that, if it could be handled normally in the light of the buyer's business. Then, too, it would appear that a sudden economic crash which would have the effect of greatly reducing consumption, as compared to normal times when there was a comparatively free market, would be entitled to some consideration in determining whether the conditions contemplated in the quoted provisions would allow the taking of less than the "exact" minimum quantity "each day." The words "per day," "daily" and "each day" appear to be as consistent with the idea that they required the buyer to take a total of 1,825,000,000 (365 X 5,000,000) cubic feet annually, as that he should pay, not only for that quantity, but more, if actually taken, and in addition all deficiencies below the minimum on any days during the entire year. In other words, it would seem that these terms are as appropriate for measuring a year's consumption, as for expressing a requirement that the buyer should pay for a minimum of 5,000,-

000 cubic feet each day, regardless of the total annual deliveries. It is beyond dispute that, in actual practice, all of the charts were on a weekly basis, as the statements offered by either side show. The court must conclude, therefore, that evidence outside of the terms of the written contract is necessary to determine its meaning.

When we enter this field, we find substantially the following facts: Imperial had operated its carbon plant for some 25 years prior to signing the contract with Monroe on November 24, 1947, and was badly in need of a supply of gas to continue, because its previous source had been terminated. It had in its employ one R. F. Seiler, who was also a very close personal friend of Monroe. Seiler knew that Monroe already had some acreage under lease, with two producing wells thereon, and in view of their relations, suggested to the officers of Imperial that his friend might be induced to procure other leases and to drill wells sufficient to supply Imperial's requirements. With the consent of his employer, he proceeded to obtain these leases, seven of the nine in his own name, using Monroe's money, but all of them were transferred to the latter before execution of the contract. As a witness, Monroe testified that, in view of the fact that he and Seiler had been friends all their lives, having attended high school together, his confidence was such that he left to Seiler the responsibility of reaching an agreement on practically all matters, except the now highly important point of requiring that Imperial, or its assignee, take a minimum of 5,000,000 cubic feet per day, regardless of the over-all consumption.

Before either Monroe or Imperial spent any money, the terms of the proposed contract were agreed upon, evidently worked out in advance, in the form of what has been called a "letter of intention," dictated by the present counsel for Monroe in the presence of Seiler and Paul Hartman, the latter as Vice-President of Imperial, dated June 2, 1947, which was addressed to "Louisiana Gas Production Company" (the name under which Monroe was operating his gas properties), "Attention of Mr. R. F. Seiler," who, as stated, was at that time superintendent for Imperial. In general terms, this letter stated that Louisiana Gas Production Company had represented that it had "available" lands within certain limits, in Union Parish, "upon which you contemplate the drilling of a number of wells"; that, if successful in obtaining leases thereon, and their development *"to the extent that you have available for delivery therefrom an amount of gas equivalent to or in excess of five million (5,000,000) cubic feet of gas per day, then and in such event Imperial * * * will enter into a contract for the purchase of gas to be produced from said wells of an amount equivalent to a daily average of not less than five million (5,000,000) cubic feet of gas per day."* The price was set at 3¢ per thousand feet, the pressure stipulated, with delivery "at the mouth of the respective wells * * *," and otherwise the proposal was in all respects the same as that incorporated in the contract of November 24, 1947. The concluding paragraph of the letter was as follows: "The purpose of this letter is to briefly outline our proposal to you with the understanding with you that a definitive contract will be drafted and entered into between us at a later date which said contract will contain the clauses customary and usual in contracts with respect to the purchase and sale of natural gas at the well head." At the top of this letter appears the following notation in pencil: "This letter was prepared by A. T. Shotwell in presence of R. F. Seiler and Paul A. Hartman." The only reasonable conclusion to be drawn is, that Seiler, although still an employee of Imperial, was present on behalf of Monroe, and Hartman was representing Imperial. It is inconceivable, therefore, that it should not have been shown to Monroe by Seiler, and most probably its terms discussed, although the former denied any familiarity with it and insisted that at all times he indicated the desire that the agreement should be according to his present contention. However, when called on cross-examination, Seiler testified as follows:

"Q. Isn't it true that the contract which was finally negotiated between Monroe and Imperial on November 24th, 1947 was the contract which eventuated from this letter of intent and understanding that had been reached in June, isn't that true? A. Mr. Snellings, I want to tell you everything I know, but you are trying to pin me down to one fact which I do not propose to be pinned down to. As the result of Mr. Monroe's conversation with Mr. Hartman that letter was signed.

"Q. As a result of those talks the contract was eventually signed? A. Yes.

"Q. Was there any disagreement between Monroe and Imperial over the terms of the letter of intent? A. I don't know.

"Q. Not as far as you know? A. I don't know anything about that."

Following the signing and delivery of the letter of intention, Seiler began assembling the necessary leases in the following order as to dates: June 2, the same day as the letter of intention, June 16, July 18, September 5, October 25, and the last on November 7, 1947, as disclosed by Exhibit "A" attached to the said contract. The wells drilled by Monroe were completed as follows:

| "Well | Date of Completion |
| --- | --- |
| Dean No. 1 | October 16, 1947 |
| Chapman No. 1 | November 1, 1947 |
| Dean No. 2 | November 16, 1947 |
| Rabun No. 2 | December 6, 1947 |
| Rabun No. 1 | December 22, 1947 |
| Rabun No. 3 | January 9, 1948 |
| Rabun No. 4 | February 6, 1948 |
| Rabun No. 5 | April 4, 1948 |
| Chapman No. 2 | April 10, 1948 |
| Smith No. 1 | April 12, 1948 |
| Smith No. 2 | April 28, 1948 |
| Rabun No. 6 | July 22, 1948 |
| Smith No. 3 | January 22, 1949" |

It will be noted that the first three were completed before the contract was signed. Imperial had evidently been working on its pipeline across the Ouachita River and its gathering system, for connection was made with the wells in time to begin delivery of gas on December 15. It has been stipulated that the production of the Monroe wells was insufficient to deliver the minimum of 5,000,000 cubic feet per day until mid-April, 1948, after which time it was made on a weekly basis, as stated, for some five months, until the week ending September 18. Thereafter, the weekly minimum take of 35,000,000 feet was never again reached until the property had been taken over by United. The charts were computed at all times, weekly, although Seiler insisted, in his testimony, that one experienced in the business could by simply looking at them on the meters tell in thirty seconds how much was being delivered on any day. The carbon black plant was shut down entirely during August and September, 1948, the months in which the alleged shortages in the daily take by Imperial or Hycarbon occurred and for which payments were made.

The transfer from Imperial to United was made as of October 1, 1948, but complete delivery was not accomplished until the 5th of that month. Evidently, when it became certain that this assignment would go through, Seiler brought to the attention of Hartman, Vice-President of Imperial, and also to Monroe, provisions of the contract of November 24, 1947, now relied upon, and in accordance therewith, either figured himself or had the office employees of Hycarbon (to whom the properties of Imperial had been transfered before sale to United) to do so, the amount of shortages for the last two months of its operations, August and September, and in each instance the alleged shortage was less than one day's minimum for a month, to wit, August, 3,401,000 cubic feet, valued at $102.03; September, 4,659,000 cubic feet, amounting to $139.77, or a total of 8,060,000 cubic feet and $241.80, which figures were entered on the margin of a check as "deficiencies," in which the full amount of the gas actually taken was also included, amounting to a grand total of $4749.63. This check, dated October 5, 1948, made payable to Louisiana Gas Production Company, was signed "Hycarbon Gas Corporation by R. F. Seiler, President." It was indorsed "for deposit only, Louisiana Gas Production Company, by R. F. Seiler," and cancelled by the bank on which it was

drawn on October 6, 1948. The fact that this payment for these deficiencies had been made was unknown to plaintiff until after this suit had been filed. The evidence tends to support the conclusion that neither Hartman nor Monroe had thought about deficiencies until brought to their attention by Seiler. The latter testified that the payment for these deficiencies was necessary in order to give a good title to United. However, no record of this was ever made in the records of the parish, by which a purchaser would be so informed in examining title. Presumably, the charts and records of production by both Imperial and Hycarbon for the short time they had operated under the contract, were turned over to United when the transfer to it was completed. There is no proof as to whether they were checked at that time or afterwards, until the notice of cancellation was received, to see what the deliveries had been, the reason, no doubt, being its interpretation of the contract according to its present contention. Had they been examined, United would have found nothing to inform it of the interpretation thus placed upon the contract or that Monroe would insist upon payment for deficiencies in the manner now claimed. Of course, defendant is correct in the position that it was not his duty or responsibility to tell United what the contract meant. That was a matter for the latter and its attorneys. However, such evidence does have a bearing upon the weight to be given to the testimony of the witnesses Seiler and Monroe.

The unfamiliarity of Monroe with the whole matter is graphically illustrated, both by his answers to questions when first called on cross-examination and by the character of his direct examination in his own behalf. His principal business was supplying cordwood to paper mills. On the other hand, Seiler had spent all of his adult life in the gas business. The two had been, as stated, life-long friends. Seiler knew, no doubt, that Imperial was "broke," as Monroe testified, and in view of the smallness of the amount involved, Imperial would have little incentive to question the language used in the contract, or the request to pay for the claimed deficiencies. In fact, many of the circumstances bear the earmarks of a preconceived plan to cancel the contract in order to get a better price for the gas (which, now, would probably be more than twice the stipulated rate of 3¢ per thousand feet), if United failed to comply with what is now contended was its meaning. Hence, the testimony of these two witnesses must be weighed in the light of all the circumstances. The Court must assume there were sufficient reasons for the failure to call Paul Hartman, former executive of Imperial, as a witness by either side.

It is not believed that the testimony of the witness Boardman or the contract of the Thermatomic · Carbon Company with Imperial throw any light on the question involved here. It is true that this contract provided an "average" minimum, but it was made by persons dealing at arms' length.

Neither is it thought necessary to go into the questions of putting in default or estoppel, in view of the conclusion stated later in this opinion.

After the purchase by United of the Imperial properties, effective October 1, 1948, but which were not fully delivered until the fifth of that month, for the first six days, the consumption was at the rate of approximately 4,500,000 feet per day. Thereafter, throughout the months of November, December, January, February and March, more than 6,000,000 cubic feet per day were consumed, and during the months of April and May, in excess of 5,000,000 feet per day was withdrawn. Beginning on June 2 and continuing through July 6, a little more than 4,600,000 a day was taken; July 7–14, in excess of 5,600,000; and beginning with July 15, it dropped again to figures ranging from 4,600,000 down to 4,000,000; then for three days between 3,900,000 and 3,700,000 feet; and then on August 9, it again rose to more than 5,000,000 and continued at those figures until the 28th of that month. Starting on the 29th of August, consumption again dropped gradually to a little in excess of 4,300,000 feet until September 4, when it decreased further to 3,900,000, 2,300,000

feet and 2,900,000 feet for three days and to 3,400,000 for the fourth day. Following this reduction, beginning with September 8 through the remainder of September, October, November and December, 1949, except for three days, September 29, 30 and October 1, the withdrawals were more than 5,000,000 feet per day. Over the entire period of some fifteen months, from October 1, 1948, through December 31, 1949, with the exception of the months of June, July and August, 1949, the monthly withdrawals ran from 2,000,000 to more than 45,000,-000 cubic feet per month in excess of an average daily take of 5,000,000 feet. The deficiencies were, for June and July, 9,-000,000 feet each, and for August, 2,000,-000 feet, respectively. On a weekly basis, the manner in which the well charts were kept, the average was less than the minimum of 5,000,000 feet per day in the first week of October, 1948, and during five days over which complete delivery of the property had not been made; four weeks in June; the entire month of July, the week ending August 9, and the final week ending September 6, or a total of eleven weeks. The daily withdrawals fell below the minimum of 5,000,000 cubic feet on sixty-seven days, amounting to a total of 38,274,000 cubic feet, having a value at 3¢ per thousand of some $1,048.00, in round figures.

The quantity actually taken over the fifteen-month period, October 1, 1948, to December 31, 1949, was 2,553,000,000, which at 3¢ made a total price of $76,606.-95, actually paid to defendant, as against a total of 2,285,000,000, at the minimum rate of 5,000,000 feet per day for the same period, for which defendant would have received $68,550. In other words, he received some $8,000 more than would have been the case under a literal compliance with the contract of taking or paying for 5,000,000 cubic feet per day.

When United acquired the property of Imperial and Hycarbon, they were taken into a larger system which functioned on the basis of its own production and commitments. In addition to the carbon black plant thus acquired and the contract which it took over with Thermatomic Carbon Company, the terms of which permitted the latter a variation of from 5,000,000 or more per day, down to as little as 500,000 cubic feet, United had to maintain in its line a supply sufficient to meet these variations, and it also had to take approximately 3,000,000 feet per day from what was known as the Ouachita-Hamilton wells to avoid danger arising from their low pressure. During the months of June, July and August and a part of September, when less than 5,000,000 feet per day was taken from the Monroe wells, Thermatomic had cut its acceptance under its contract to less than half and at times down to 500,000 feet. It is true that United in the operation of the carbon black plant acquired from Imperial, consumed some 8,000,000 feet of gas per day, but only about 1,000,-000 came from Monroe's leases, most of the balance from his wells going to Thermatomic. When the latter cut its taking so drastically, United reduced the contribution from its own line from some 4,000,000 to approximately 1,000,000 feet per day. This, with 3,000,000 per day from the Ouachita-Hamilton wells, brought about the reduction in withdrawals from Monroe's wells. The conditions described in the testimony of plaintiff's witnesses as to the reasonable necessity for this action was not seriously disputed, it simply being insisted that United was bound to take the Monroe gas, without regard to these other considerations. The conclusion is that United's course under the circumstances was "normal and proper."

It is believed that a proper interpretation of the contract, in the light of what has been said, is that the buyer was bound to take or pay for as near 5,000,000 cubic feet of gas per day as normal operating conditions permitted, but that this did not require that it should also pay for deficiencies if the total consumption equaled or exceeded an average of 5,000,000 cubic feet per day.

Plaintiff should, therefore, have judgment as prayed for.