## In re INTERNATIONAL MATCH CORPORATION.

District Court, S. D. New York.

Aug. 26, 1937.

Rosenberg, Goldmark & Colin, of New York City (George K. Hourwich, of New York City, of counsel), for trustee.

Chamberlin, Kafer, Wilds & Jube, of New York City (Frederick G. Weisser and Thomas H. Pinney, both of New York City, of counsel), for claimant.

LEIBELL, District Judge.

This is a petition by James L. Reed, as executor of the estate of Edward S. Romine, deceased, to review an order, dated June 11, 1937, made by Hon. Oscar W. Ehrhorn, referee in bankruptcy, expunging a claim of said Edward S. Romine in the sum of $52,500 filed October 4, 1932, against the Irving Trust Company, trustee in bankruptcy of the International Match Corporation.

This claim is for damages for the breach of a contract of employment, which contract reads as follows:

"Agreement Between Mr. E. S. Romine of Wheeling, W. Va. Hereinafter Called 'Romine' and International Match Corporation, Hereinafter Called 'Imco'.

"1. Imco agrees to employ Romine and Romine agrees to perform such services as may be assigned to him by F. Atterberg, Vice-President of International Match Corporation, and to use his best efforts to further the interests of Imco as regards all

matters pertaining to the American match business, but Romine shall not be required to devote more time to his duties hereunder than an aggregate of 60 days in any one year during the term hereof.

"2. As remuneration for such services Imco agrees to pay Romine the sum of $2,000 per month, payable at the end of each month, such payments to begin the date this agreement is signed and to continue until the termination of this agreement, which shall be the 10th day of January, 1931.

"3. If Romine, before January 10th, 1931, can bring about the sale to Imco on terms acceptable to the latter of at least four of the small independent match manufacturers now existing, Imco will pay Romine a sum of $50,000 in cash.

"4. Romine agrees that for a period of 10 years after January 10th, 1931, he will not directly or indirectly engage in the match business except in the states of New Mexico and Arizona nor use his influence or experience in the interest of any match manufacturer other than Imco and its affiliated companies, and as compensation Imco will pay Romine the sum of $500 on the last day of each and every month during the said ten year period aforementioned.

"Dated: New York, June 5, 1929.
             "E. S. Romine
"Witnesses:
"F. Atterberg
"Fred G. Weisser
      "International Match Corporation
         "Ivar Kreuger, President.
"Witnesses:
"F. Atterberg
"Fred G. Weisser."

The claim is not based upon the whole contract, but only upon paragraph 4. The agreement contained in paragraphs 1 and 2 was fully carried out; the terms of paragraph 3 were not fulfilled by Romine and he received no payment thereunder, nor in any claim made in respect thereof. The payments of $500 a month under the terms of paragraph 4 were made during the year 1931 and for the months of January, February, and March of the year 1932. This claim is for $500 a month for the remaining eight years and nine months of the ten-year term under paragraph 4. The International Match Corporation was adjudicated a bankrupt April 19, 1932. Romine died January 1, 1934.

The trustee's filed objections to the claim are as follows:

"For a First Complete Defense to the Aforesaid Claim:

"4. That Edward S. Romine breached his contract with the bankrupt prior to the bankruptcy in that Edward S. Romine had a substantial interest in Pacific Match Company for some years prior to his death and died possessed of a very large stock interest in the said Pacific Match Co. which is located in the State of Washington and is not owned by International Match Corporation or any of its subsidiaries.

"For a Second Complete Defense to the Aforesaid Claim:

"5. That the aforesaid contract was made without consideration and that the said Edward S. Romine performed no services thereunder.

"For a Third Partial Defense to the Aforesaid Contract:

"6. That Edward S. Romine died on January 1, 1934, a resident of Wheeling, West Virginia, and one John L. Reed, Esq., is the Executor of his estate.

"For a Fourth Complete Defense:

"7. That the aforesaid claim of Edward S. Romine, deceased, has not been duly proved herein."

The trustee contends: (1) That Romine had, without the knowledge of the bankrupt, breached the terms of his contract by indirectly engaging in the match business of a competitor of the bankrupt; that Romine had committed the breach through the medium of his large stock ownership in the Pacific Match Company; and that Romine himself recognized his obligation not to retain said stock after January 10, 1931. (2) That even if Romine had not violated the terms of his employment, that having died on January 1, 1934, no claim upon his employment agreement could be made for a date beyond January 1, 1934, or in an amount greater than $10,500, less the discounted value thereof to April 19, 1932, the date of the bankruptcy.

In its petition to review the order of the referee, dated June 11, 1937, dismissing the claim, the claimant contends:

"That said order was and is erroneous in that: Ownership of the stock of Pacific Match Company did not constitute a breach of the claimant's contract with the bankrupt and the amount of the claim is not limited by the death of the claimant."

The testimony before the referee educed the following facts:

That on June 5, 1929, Romine executed the hereinabove quoted contract. That one week later, on June 12, 1929, he executed another agreement with the International Match Corporation under which he granted to the International Match Corporation the exclusive right of buying at least a majority of the preferred and the common stock of the Pacific Match Company, the option to be in effect until January 10, 1931. The agreement provided the manner in which the optioned stock was to be valued and payment made therefor. In consideration of the granting of the option, the International Match Corporation loaned to the Pacific Match Company the sum of $100,000, without interest, with a provision that if the International Match Corporation failed to exercise its option, the said sum of $100,000 "shall belong to and become the property of Pacific and International shall have no claim thereto." In the said agreement of June 12, 1929, it was recited that the capital stock of the Pacific Match Company consisted of 5,000 shares of the par value of $100 each of preferred stock, of which 3,000 were outstanding, and 5,000 shares of common stock, without par value, all of which was outstanding; that the preferred stock had no voting rights and that the common shares had cumulative voting rights. It will be noted that the date of January 10, 1931, was the date of the expiration of the option that Romine granted International Match Company on the Pacific Match Company stock. That date was also the date fixed in the fourth paragraph of Romine's contract of employment by International Match Corporation, after which said date Romine agreed that for a period of ten years he would "not directly or indirectly engage in the match business except in the states of New Mexico and Arizona nor use his influence or experience in the interest of any match manufacturer other than Imco and its affiliated companies."

Prior to January, 1931, the claimant had been a director and chairman of the board of directors of the Pacific Match Company, Inc., whose main office was in Tacoma, Wash. This company sold matches all over the United States, specializing where it could obtain water transportation along the Pacific Coast, around through the Gulf of Mexico and up along the Atlantic coast as far as Baltimore, Md.

The stock of the Pacific Match Company is and was closely held among a limited number of stockholders, the larger holders being less than 15 in number. On or about January 15, 1931, Romine sold to James L. Reed 250 shares of preferred and 750 shares of common stock of the Pacific Match Company and accepted the latter's note for $22,500 in payment therefor. However, Romine apparently still retained 75 shares of preferred and 625 shares of common in the aforesaid corporation, which amounted to one of the largest single holdings of stock.

Payments on principal and interest in the sum of $9,000 were made on the said note until December 19, 1933, when Reed found it impossible to continue; Romine thereupon took back the stock he had sold to Reed. Two weeks later, on January 1, 1934, Romine died; at that time he was the largest single stockholder in the Pacific Match Company, owning 325 preferred and 1,375 common shares.

■ The decision of this case depends on the answer to the question, Did the retention, by Romine, of a substantial number of shares of stock in the Pacific Match Company after January 10, 1931, constitute a breach of his agreement not to "directly or indirectly engage in the match business"? I think it did. It would seem that the main purpose of the agreement upon which this claim is based was to keep Romine out of the match business after his term of active employment by International Match Corporation was ended on January 10, 1931, and to have him dissociate himself completely from the business of competitors, including Pacific Match Company.

■ "Business contracts must be construed with business sense, as they naturally would be understood by intelligent men of affairs." North German Lloyd v. Guaranty Trust Co., 244 U.S. 12, 24, 37 S.Ct. 490, 492, 61 L.Ed. 960.

On December 31, 1931, there were issued and outstanding 2,993 shares of preferred stock and 4,800 shares of common stock of the Pacific Match Company. The retention by Romine of a large stock interest in the Pacific Match Company (75 shares of preferred and 625 shares of common) would naturally give him a partisan as well as a financial interest in the success of that company. Through that stock ownership he would be indirectly engaged in the match business. Further, it would be but natural that his "influence and experience" would be exercised in the interest of

a match company in which he held a large block of stock. That would be contrary to his agreement, which not only barred him from using his influence and experience in the interest of any competitors of International Match Corporation, but by its language required him, if he should use his influence and experience in the match business, to do so in the interest of International Match Corporation and its affiliated companies. The provisions of this paragraph 4 were based upon the truth of the biblical admonition that no man can serve two masters. .

The purpose of paragraph 4 of the agreement of June 5, 1929, was at least to neutralize the position of Romine in the match business. He would not be in the position of a neutral if he had a large stock interest in a competitor of the International Match Corporation. Romine himself recognized this obligation imposed on him under paragraph 4 of the agreement of June 5, 1929, in a letter he wrote Mr. James L. Reed. Apparently, after January 10, 1931, when the option to International Match Corporation expired, Romine had offered his stock to Mr. Snyder, the president of the Pacific Match Company and his associates, but they advised Mr. Romine that they would rather not consider the purchase of his Pacific Match Company stock at that time. Romine thereupon and on January 15, 1931, sold part of his stock holdings, to wit, 250 shares of preferred stock at $75 a share and 750 shares of common stock at $5 a share, to a friend, Mr. James L. Reed, a banker and the executor of his estate. Mr. Reed executed his note in the sum of $22,500 for the purchase price and put up the stock as collateral thereto.

In his letter, dated January 15, 1931, wherein he accepted Mr. Reed's offer to purchase 250 shares preferred and 750 shares common stock of the Pacific Match Company, Romine wrote:

"Under ordinary circumstances I would not think of selling this stock at the above price, however, since my contract with International Match Corporation provides that I cannot remain in the match business and avail myself of the monthly payments provided in this contract, I feel that in the long run it is much better for me to sacrifice my holdings than to continue to carry them and thus forfeit my salary contract with the International."

Here Romine has interpreted the contract as he understood it. Why did he not then sell the remainder of his large holdings of stock in the Pacific Match Company? Counsel for the claimant urges that this statement was only sales talk; but it is more than mere "puffing" to encourage the purchase of the stock by Reed. This was the acceptance of an offer from Reed and the statement set forth the reason why Romine was willing to sell the stock at a price below what he felt was its fair value.

Romine's own interpretation of paragraph 4 of the agreement of June 5, 1929, and his conduct in acting in part on said interpretation should be given great weight in construing said paragraph 4 of the agreement. As was stated in Brooklyn Life Ins. Co. v. Dutcher, 95 U.S. 269, at page 273, 24 L.Ed. 410:

"The practical interpretation of an agreement by a party to it is always a consideration of great weight. The construction of a contract is as much a part of it as anything else. There is no surer way to find out what parties meant, then to see what they have done. Self-interest stimulates the mind to activity, and sharpens its perspicacity. Parties in such cases often claim more, but rarely less, than they are entitled to. The probabilities are largely in the direction of the former."

The language used by the parties in paragraph 4 of the agreement of June 5, 1929, is broad and all-inclusive. Romine agreed that he would not "directly or indirectly" engage in the match business "except in the states of New Mexico and Arizona," where the record shows there is very little match business. Further, no other match manufacturer was to have the benefit of his influence or experience. In return for the fulfillment of his part of the agreement as set forth in the fourth paragraph, the International Match Corporation agreed to pay Romine "the sum of $500 on the last day of each and every month during the said 10-year period" aforementioned. The International Match Corporation kept its part of the agreement down to the month of the bankruptcy, but Romine did not. After the bankruptcy of International Match Corporation, he filed a claim on October 4, 1932, in the sum of $52,500. In my opinion, the referee was justified by the record herein in expunging the claim.

Although under this finding it is unnecessary to pass upon the second contention of the trustee that even if Romine had not violated the terms of his employment,

his death on January 1, 1934, would bar any claim for the $500 a month payments after that date, I wish to state that I agree with the conclusion of the referee that Romine's death would so limit his claim. See Rubin v. Siegel, 188 App.Div. 636, 177 N.Y.S. 342, and N. Y. Trust Co. v. Island Oil & Transport Corp. et al. (C.C.A.) 34 F.(2d) 653.

The report of the referee expunging the Romine claim entirely is hereby approved and confirmed.

Submit order on notice.