# MAX M. NAFTALIN v. JOHN WOOD COMPANY.

## 116 N. W. (2d) 91.

### June 29, 1962—No. 38,238.

*B. Warren Hart, A. Patrick Leighton,* and *Faricy, Moore & Costello,* for appellant.

*Bruce B. James* and *Ernest A. Lindstrom,* for respondent.

NELSON, JUSTICE.

Appeal by defendant from an order of the District Court of Ramsey County denying a motion for amended findings or in the alternative for a new trial.

Plaintiff, Max Naftalin, prior to entering into the contract involved in these proceedings, was president of Thomas-Terry Corporation of America, which sold bulk milk dispensers under the trade name of "Sani-Serve." The "Sani-Serve" dispensed milk from either a 3- or 5-gallon can through a unique hose arrangement, originated by plaintiff, which eliminated messiness and unsanitary conditions. Thomas-Terry employed other companies to manufacture the components of its "Sani-Serve" dispenser and it arranged for their sale.

In 1952 defendant, John Wood Company, became interested in manufacturing dispensers utilizing plaintiff's invention and opened negotiations to purchase it. By a contract entered into by Wood, Thomas-Terry, and plaintiff on August 27, 1952, Wood purchased most of the assets of Thomas-Terry, including the invention, paying Thomas-Terry the reasonable value of certain physical assets—about $90,000 —and an additional $130,000 for all intangible assets, including "all patents or patent applications, conceptions, developments or improvements owned by [it or plaintiff], or which [plaintiff] has conceived or may conceive * * * with respect to bulk liquid dispensers or liquid dispenser cans or apparatus or device used or useful in connection with bulk liquid dispensers * * * at any time thereafter." Thomas-Terry and plaintiff agreed to hold defendant harmless against any suits for patent infringement.

The contract also provided that defendant would not assume any liabilities of Thomas-Terry or plaintiff and that Thomas-Terry would change its name. In compliance with that requirement, its name was changed to Alan, Inc., shortly after the contract was executed.

The contract also required plaintiff to assist defendant in its changeover for a period of 3 months, which he did. It also prohibited him

from competing with defendant in the following language (paragraph 12):

"Naftalin agrees, in consideration of the payments to be made to him as hereinafter provided, that for a period of ten (10) years commencing with the closing date fixed as provided in paragraph 13 hereof, he will not compete with John Wood or any company affiliated with or otherwise related to John Wood in the United States or Canada, directly or indirectly, individually, or as a partner, or as an officer, employee, agent or owner or part owner of a corporation or other form of enterprise, *in the manufacture or sale of bulk liquid dispensers or liquid dispenser cans, or apparatus or device used or useful in connection with bulk liquid dispensers or any apparatus or device performing a similar or related or improved function, or any apparatus or device performing any function which would partially or wholly obsolete bulk liquid dispensers or adversely [affect] the use or sale of bulk liquid dispensers.* Nor will he at any time disclose the volume of business transacted by Thomas-Terry or John Wood in *bulk liquid dispensers* or *liquid dispenser cans,* or the profits or potentialities of such business. John Wood agrees to pay Naftalin, in consideration of his obligations under this paragraph 12 and his compliance therewith, Six thousand five hundred dollars ($6,500) each June 1 and December 1 beginning with June 1, 1953, over a period of ten (10) consecutive years, said payments to aggregate One Hundred thirty thousand dollars ($130,000)." (Italics supplied.)

The contract was prepared by defendant's lawyers in New York. The original draft provided that plaintiff would not compete with defendant in the manufacture and sale of "liquid dispensers." The second draft incorporated changes made at plaintiff's specific request—the insertion of the word "bulk" before the words "liquid dispensers" in several places where those words appeared in the contract, including paragraph 12. Thus, that paragraph designedly provided that plaintiff would not compete with defendant in the manufacture and sale of "bulk liquid dispensers or liquid dispenser cans."

Negotiations between the parties included discussions as to method of payment of the purchase price. Plaintiff testified that defendant was

138

willing to pay the entire purchase price in a lump sum, but because of tax advantages he chose to take payment of the consideration to which he was entitled under paragraph 12 in installments.

After assisting defendant pursuant to the contract plaintiff continued to maintain an office at the former address of Thomas-Terry for collection of accounts and deferred payments for some time. Thereafter, for a period of 15 months he sold freezers. He then tried promotion of various refrigeration units for use in stores and homes and a biological refrigerator for use by hospitals, doctors, and drugstores. In 1958 he began selling a coin-vending machine he called the "Sani-Freeze," which dispensed milk and juices in cartons. It was a chest-type of storage box similar to machines in use for many years. Bottles or cartons vended by it moved on a rail, one being released to the buyer upon the insertion of a coin.

To further sales of the "Sani-Freeze" plaintiff prepared a brochure and sent it to dairies in this area with a letter recommending that the machines be placed in gas stations, factories, motels, elevators, offices, garages, bowling alleys, and other public and private locations. (In 1954 or 1955 he had purchased a list of dairies consisting of some 12,000 to 15,000 names.) In the letter and brochure he called attention to the money-making potential of this style of vending machine and its advantages over other similar devices. He also began to solicit orders directly, representing to the potential customer that he was Mr. Naftalin, formerly of the Thomas-Terry Corporation. He employed salesmen and disposed of 179 machines in Minnesota, Iowa, Wisconsin, North and South Dakota, and Montana.

In the latter part of 1958 plaintiff stopped selling the "Sani-Freeze" and began selling the "Alvend," an upright coin-operated vendor which put out half-pint or third-quart containers of milk or juices. This machine had not been perfected and he sold only 10.

The John Wood Company had become aware of plaintiff's activities in selling the coin-operated carton milk and juice dispensers, and on April 1, 1959, wrote him as follows:

"The sale by you or your Company of such 'ALVEND' milk dispensers, or milk vendors as called in your literature, unquestionably

is in direct violation of the provisions of Paragraph '12' of the John Wood Company—Thomas-Terry Corp. of America, Inc.—Max M. Naftalin Agreement dated August 27, 1952, as amended.

\* \* \* \* \*

"John Wood Company hereby makes formal demand on you, Max M. Naftalin, and on your Company, Alan, Inc., to immediately cease and desist from the sale, or offer for sale, of the new milk dispensers being offered for sale by your Company, Alan, Inc."

Plaintiff answered on April 8, 1959:

"It is apparent that you have been misinformed, since my machine is not, as you state, 'a new milk dispenser.' It is, instead, as its name implies, a vending machine, coin operated, designed to merchandise individual articles of food, drink, or other commodities, of the small size and small retail price my machine will accommodate. It handles all manner of articles and beverages, and is not limited to dairy products—the sale of small individual cartons of milk being incidental, and but one of the many applications to which it is put. It in no way involves, or relates to, the bulk handling of milk, which is, of course, the only subject of my agreement with you.

"I have, at all times, conscientiously observed the provisions of my agreement of August 27, 1952, and shall, of course, expect that we both shall continue so to do. *As you know, paragraph 12 of our agreement was specifically drawn so as to relate, and it does relate, solely to competition in the field of bulk milk dispensers; and my machine for the coin vending of individual packaged items is, obviously, not within its provisions.* I am sure that, with this information before you, you will fully agree with me." (Italics supplied.)

Defendant wrote plaintiff again on May 6, 1959, repeating its contention that sales of the "Alvend" were in breach of paragraph 12 of the contract and informing him:

"Unless John Wood Company receives notice promptly from you that you and your Company, Alan, Inc., have ceased the sale, or offer for sale, of your 'ALVEND' dispenser for milk, John Wood Company will make no further payments to you, beginning with the payment due

June 1, 1959, of the remaining payments to you on the unpaid balance * * *."

Plaintiff's attorney answered this letter on May 13, as follows:

"I. Neither Mr. Naftalin nor Alan, Inc., are presently nor do they intend to manufacture or sell any apparatus or device which would obsolete *bulk milk dispensers* or affect the use or sale of *bulk milk dispensers,* unless you fail to fulfill your obligations under the agreement with them dated August 27, 1952.

"II. Alan, Inc., does have a coin-operated vending machine which can be used for the sale of several products whether they be food, drink, or other commodity. All of these products are saleable in individual cartons upon insertion of the proper coin or coins.

"Although the above machine is not presently being merchandised, both my client and I are frankly quite surprised that your company contends that we do not have the right to sell a coin operated vendor which may be used to vend individually packaged milk along with other products.

"Certainly by no stretch of the imagination can it be said that such a *vendor,* even if sold, would obsolete bulk milk dispensers."

Plaintiff discontinued the sale of the "Alvend" machine after receiving defendant's first letter. However, defendant refused to make the payment of $6,500 due June 1, 1959, and plaintiff brought this action to recover it. Defendant in its answer alleged that plaintiff had engaged in competition with it in violation of paragraph 12 and in a counterclaim asked rescission of the contract or a judgment that it be released from any further obligations thereunder and that it recover $78,000 previously paid plaintiff pursuant to paragraph 12. In its counterclaim defendant alleged it had suffered damages of $130,000, the entire amount it had agreed to pay plaintiff as consideration for his agreement not to compete.

The case was tried without a jury and at its close the court ruled from the bench in favor of plaintiff, dismissing defendant's counterclaim. In an order subsequently issued the court determined that plaintiff's sale of refrigeration equipment and packaged liquid vending

equipment and machines, and his circulation and distribution of advertising materials for the promotion and sale of those products—

"(a) Did not cause the defendant to suffer a loss of consideration for the contract dated August 27, 1952, and

"(b) Did not cause the defendant to suffer or sustain any damage or loss, and

"(c) Did not constitute a violation of any provisions of the contract dated August 27, 1952."

The court also determined—

"That the plaintiff is entitled to recover from the defendant the installment in the sum of $6,500.00 due June 1, 1959 * * *."

Defendant thereafter moved for amended findings or for a new trial and appeals to this court upon denial of such motion.

The crucial question is whether plaintiff's activities in the sale of coin-operated vending machines between April 1953 and April 1, 1959, constituted a violation of paragraphs 10 and 12 of the agreement. While the dispenser sold by plaintiff to defendant was clearly restricted to bulk milk or liquid dispensing equipment before the agreement was made acceptable to the plaintiff, the activities prohibited by paragraph 12 definitely did not include manufacture or sale of all other kinds of milk-selling equipment. Ambiguity therefore exists as to the meaning of that paragraph.

The protection agreed upon by plaintiff must of necessity contemplate machines competitive to "bulk liquid dispensers or liquid dispenser cans"; or those which would provide similar, related, or improved functions in bulk liquid dispensers; or machines which would obsolete the bulk liquid dispensing equipment. Counsel stipulated at the trial that the contract did not prohibit plaintiff's sales of the biological refrigerator and freezers. The trial court also found that it did not prohibit sales of common storage refrigerators or coin-operated vending machines.

Defendant claims, however, that plaintiff's activities in the sale of coin-operated vending machines for dispensing milk or juices in packaged form violated both the letter and the spirit of paragraph 12.

Defendant contends also that such breach of the contract relieves it of any duty to continue payments to plaintiff and also that under the circumstances it is not held to proof of the amount of damages sustained.

Plaintiff contends that his insistence upon insertion of the word "bulk" before the words "liquid dispenser" throughout the agreement was obviously for his protection if he chose to manufacture or sell devices not related to bulk liquid dispensing equipment. He also contends that it had never been considered that vending machines were even remotely related to the bulk liquid dispensing equipment acquired by defendant under the agreement. There was testimony that some form of coin package vendor has been in use for 30 years.

Plaintiff further contends that defendant to sustain its position must prove:

"(1) That plaintiff's activities in the sale of vending machines were a violation of paragraphs 10 and 12 of the agreement which prohibited the plaintiff from manufacturing and selling 'Bulk Liquid Dispensers.'

"(2) That defendant suffered a loss or failure of consideration which would permit it to rescind the agreement.

"(3) That defendant suffered damages in the sum of $52,000.00."

The record fails to show that any specific machine sold by plaintiff adversely affected defendant's sales of bulk liquid dispensers or dispenser cans. In fact, defendant made no effort to establish any specific loss or damage due to the activities complained of on the part of plaintiff. Defendant has apparently abandoned its claim for rescission and claims that forfeiture by reason of a breach of paragraph 12 relieves it of the necessity of offering proof of any actual damages suffered. Since we uphold the trial court's determination that there was no breach of the contract, these contentions need not be considered.

■ It is a well-established rule of construction that where a contract is open to two interpretations, the one more favorable to the party who did not draft the instrument should be adopted in the absence of a clear showing that a contrary meaning was intended by the

parties at the time of its execution. Wick v. Murphy, 237 Minn. 447, 54 N. W. (2d) 805.[1] Since defendant drafted the contract in question plaintiff should receive the benefit of this rule.

The testimony shows clearly that there are differences between bulk liquid dispensers and coin-operated vending machines dispensing individual portions of milk in cartons. An expert witness called by defendant testified:

"* * * A vendor by its very nature is in the terminology of the trade is anything where you use a coin or you purchase it on the spot. My definition of a bulk milk dispenser is using the supervised location, someone draws the milk and either brings it to the table or hands it to the person and collects the money for it."

Other witnesses also pointed out that a bulk dispenser requires an attendant for its operation while a coin-operated vending machine does not. Expert witnesses called by plaintiff testified that there was little if any competition between such vending machines and bulk dispensers. Defendant's expert witnesses said that the coin-operated vending machines sold by plaintiff would "obsolete it in part." However, it is axiomatic that when a case is tried without a jury the trial court may balance the testimony as a whole and render a decision accordingly.

"The general rule is that a covenant or injunction against engaging directly or indirectly in a competing business is not absolute in the sense that it extends of necessity to every branch of employment in that line of business, but depends on the nature of the business to be protected and the natural and probable effect of the new employment on it; and if the nature of the new employment is such that it is likely to result in substantial interference with the business to be protected, it will constitute a breach of the covenant, otherwise not." Annotation, 93 A. L. R. 121, 122.

---

[1]See, Combined Ins. Co. of America v. Bode, 247 Minn. 458, 77 N. W. (2d) 533. This court there held that contracts in partial restraint of trade will be strictly construed and the restraint extended no further than the language of the contract absolutely requires.

It was undoubtedly the intent of the parties, and especially plaintiff, in modifying the agreement by inserting the word "bulk" before the words "liquid dispenser" to establish that it was not within the contemplation of the parties that the restrictive covenant should include every conceivable activity that might be carried on by plaintiff in the field of milk distribution. Defendant has not advanced a convincing argument that the term "bulk dispenser" has anything other than a commonly understood meaning. "Bulk" is generally understood to mean of indefinite proportion. In Riggs v. State, 84 Neb. 335, 340, 121 N. W. 588, 590, it was said to mean "that which is neither counted, weighed, nor measured." The words "in bulk" are defined as "in a mass: not divided into parts or packaged in separate units." Webster's Third New International Dictionary (1961) p. 293. In common usage, with reference to inanimate objects, it means large, corpulent, and not susceptible of exact proportion. Here there can be no doubt that "bulk," as used in the trade, means nothing more than a quantity of milk measured by the containers holding the liquid. Thus, "bulk dispenser" obviously would not include a machine dispensing milk in small quantities upon the insertion of a coin.

The language employed by the parties makes reference to "bulk liquid dispensers," "liquid dispenser cans," and "similar apparatus or device," which "would partially or wholly obsolete bulk liquid dispensers." The word "bulk" was placed in the agreement at plaintiff's request. The words of an instrument are to be interpreted most strongly against the party using them. 4 Dunnell, Dig. (3 ed.) § 1832; 4 Williston, Contracts (3 ed.) § 621.

"* * * While courts aim to carry out the mutual intention of the parties the ultimate test or standard of construction is the reasonable meaning of the language used, considered in the light of the circumstances. The standard is objective rather than subjective." 4 Dunnell, Dig. (3 ed.) § 1816.

Defendant argues that plaintiff's sale of coin-operated vending machines was a violation of paragraph 12 of the contract, which it contends provides in effect that plaintiff agreed not to compete in the field of milk products by any method that would in whole, or in

part, obsolete bulk liquid dispensers. In support of its contention it cites a number of cases which we will discuss.

In In re International Match Corp. (S. D. N. Y. ) 20 F. Supp. 420, 421, the question was whether there was a breach of a covenant not to directly or indirectly engage in the match business. Employee agreed that for a period of 10 years he would not "directly or indirectly engage in the match business * * * nor use his influence or experience in the interest of any match manufacturer other than the [employer] and its affiliated companies." In return employee was to receive $500 each month during the 10 years. Subsequently he obtained a large block of stock in a competing company, which gave him a partisan and financial interest in the welfare of that company. The court said (20 F. Supp. 423):

"* * * That would be contrary to his agreement, which not only barred him from using his influence and experience in the interest of any competitors of [employer], but by its language required him, if he should use his influence and experience in the match business, to do so in the interest of [employer] and its affiliated companies. The provisions * * * were based upon the truth of the biblical admonition that no man can serve two masters."

It cannot be seriously contended that the conditions attached in that case have similar import to the restrictions on plaintiff in the instant case. In the International Match Corp. case the decision hinged on the words of the agreement. It would be difficult to conceive of a covenant more all-embracing than that one was. It barred employee from competing in any way with the employer. It is obvious that he had breached the covenant not to engage in the match business when he acquired a substantial interest in a competing match company.

Masden v. Travelers' Ins. Co. (8 Cir.) 52 F. (2d) 75, 76, involved a dispute over the following covenant:

"If the agent shall at any time within one year from * * * termination of this contract for any cause whatsoever, enter the employment of any other life insurance company to work in the territory specified * * *, all right to further commissions on renewals shall cease with the date of such employment."

Plaintiff breached the condition and the insurance company stopped payment of the commissions on renewals. The court said, quoting Sutherland v. Connecticut Mutual Life Ins. Co. 87 Misc. 383, 149 N. Y. S. 1008 (52 F. [2d] 78):

"* * * 'The contract violates no public policy. It does not obligate the plaintiff to desist from earning a livelihood in the insurance business. It merely provides that, if he elects to engage in such business during the running of the policies which he has written, he will not demand the commissions upon the renewals. This was a lawful condition.' "

These cases are distinguishable from the instant case where the court found that the condition was never breached. The same is true of Chicago Life Ins. Co. v. Tiernan (8 Cir.) 263 F. 325; and Ekman v. United Film Service, Inc. 53 Wash. (2d) 652, 335 P. (2d) 813, also cited by defendant.

In West Shore Restaurant Corp. v. Turk (Fla.) 101 So. (2d) 123, a corporation sold a restaurant to plaintiff under a contract containing the condition that defendant, who had been its manager, would not compete with plaintiff within a radius of 7 miles. Subsequently two other restaurants were purchased by defendant, in another's name to conceal his ownership. The Florida Supreme Court rightly held that there was a breach of the condition not to compete. See, also, McClure v. Young, 193 Ark. 188, 189, 98 S. W. (2d) 877, where a seller covenanted "not to enter or become interested in, either directly or indirectly, the retail hardware * * * business."

Defendant cites The Coca-Cola Bottling Co. v. The Coca-Cola Co. (D. Del.) 269 F. 796, 813, for the proposition that "of necessity there is competition between the bottled drink and the fountain drink." With this statement we do not quarrel. However, it seems that the issues involved there differed from those in the instant case and that the court was referring to the severance of the bottling business from the business of supplying soda fountains with Coca-Cola syrup.

Defendant also cites Holliston v. Ernston, 124 Minn. 49, 50, 144 N. W. 415, where defendants sold a busline to the plaintiff, agreeing "not to start a bus line in Granite Falls, or drive a bus in Granite Falls,

as a part of the consideration of this bill of sale." Thereafter defendants' mother acquired omnibuses and a wagon and engaged in operating a busline with the defendants as managers. The injunction was properly granted. Again, that agreement contained an absolute restriction against competition and the parties so intended.

■ In the instant case, defendant's experts did testify that the vending machines in some manner compete with "bulk liquid dispensers," but plaintiff's expert witnesses, at least equally qualified, testified to the contrary, one being asked to give his opinion as to each item sold by plaintiff. Nor did defendant show that plaintiff ever placed such vending machines in any place in which they would in some way obsolete "bulk milk dispensers."

It is within the province of the trier of fact to resolve conflicts in the opinions of expert witnesses and in so doing it may determine the comparative weight to be given to each opinion and consider the qualifications of each expert and the source of his information. Lee v. Minneapolis St. Ry. Co. 230 Minn. 315, 41 N. W. (2d) 433; Koenigs v. Thome, 226 Minn. 14, 31 N. W. (2d) 534; 7 Dunnell, Dig. (3 ed.) § 3334. It is apparent that the trial court determined that the testimony of plaintiff's experts was entitled to the greater weight on the issue of whether plaintiff's activities were competitive.

There has been no claim of fraud, and according to the record plaintiff has shown his good faith in ceasing the sale of coin-operated vending machines after receiving defendant's first complaint.

■ Public policy requires that restrictive covenants be strictly construed and not extended beyond the true intent of the parties. Combined Ins. Co. of America v. Bode, 247 Minn. 458, 77 N. W. (2d) 533; 16 Dunnell, Dig. (3 ed.) § 8436. See Annotations, 93 A. L. R. 121 and 43 A. L. R. (2d) 94, relating to covenants not to compete.

We have in mind, of course, the well-recognized principle that forfeitures are not favored either in law or equity. The rule is stated in 17 C. J. S., Contracts, § 320:

"Whenever reasonably possible, a construction against a forfeiture will be adopted. To this end, a contract will be construed not to provide for a forfeiture unless there is a clear expression or manifestation

of the intent of the parties in this respect; and, where the contract does so provide, the provision will be strictly construed."

One claiming forfeiture carries a heavy burden of establishing his right thereto by clear and unmistakable proof. United Carbon Co. v. Monroe (W. D. La.) 92 F. Supp. 460.

■ This court has repeatedly stated that on appeal it is presumed that the findings of the trial court are correct and that the trial court considered all relevant facts in making them. The burden of showing error affirmatively by the record rests on appellant. As a court of review it is not for us to weigh the evidence since that responsibility rests upon the trier of fact. See, 1 Dunnell, Dig. (3 ed.) §§ 368, 372, 411. This court must determine from an examination of the record whether the evidence sustains the trial court's findings, and if it does, it is immaterial that the record might also provide a reasonable basis for inferences and findings to the contrary. Bicanic v. J. C. Campbell Co. 220 Minn. 107, 19 N. W. (2d) 7. Under long-established rules, where conflicts in the evidence present fact issues in a case tried without a jury, the trial court's findings thereon will not be disturbed upon appeal unless they are manifestly and palpably contrary to the evidence as a whole, and the evidence must be viewed in the light most favorable to the findings. Enderson v. Kelehan, 226 Minn. 163, 32 N. W. (2d) 286. We have fully considered the testimony and the exhibits contained in the record. The evidence is clearly in conflict on the issues. We think the findings of fact are supported by the evidence and that the order appealed from must accordingly be affirmed.

Affirmed.

MR. JUSTICE OTIS took no part in the consideration or decision of this case.

MR. JUSTICE ROGOSHESKE, not having been a member of the court at the time of the argument and submission, took no part in the consideration or decision of this case.