# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-3661

_____

David Eastling; EFP, LLC, a            *
Minnesota Limited Liability            *
Company,                               *
                                       *
          Appellants,                  *
                                       *   Appeal from the United States
     v.                                *   District Court for the
                                       *   District of Minnesota.
BP Products North America, Inc., a     *
Maryland Corporation,                  *
                                       *
          Appellee.                    *

_____

Submitted: June 9, 2009
Filed: August 27, 2009

_____

Before MURPHY, ARNOLD and GRUENDER, Circuit Judges.

_____

GRUENDER, Circuit Judge.

David Eastling and EFP, LLC (collectively, "Eastling"), entered into a real estate contract with BP Products North America ("BP") to purchase from BP the property on which Eastling had been operating a gas station. The real estate contract included a restrictive covenant preventing the sale of any non-BP petroleum products on the property. Eastling filed suit, seeking a declaratory judgment that the restrictive covenant was no longer valid and enforceable. Both parties filed motions for

summary judgment. The district court[1] granted summary judgment to BP, and Eastling appeals. For the following reasons, we affirm.

## I.    BACKGROUND

In November 2003, Eastling purchased the land and a BP-branded gas station located at 600 Boone Avenue North in Golden Valley, Minnesota, from BP pursuant to a real estate contract. Before purchasing the property, Eastling had been operating the gas station as a retail contract operator, meaning Eastling leased the station from BP. BP had initially intended to develop the property as a company-operated BP Connect convenience store and gas station,[2] but it instead decided to sell the property to Eastling.

Under the real estate contract, BP agreed to sell the property to Eastling subject to certain "Restrictive Covenants," which were "annexed . . . and made a part" of the real estate contract. The "Petroleum Restriction," one of the restrictive covenants found in the second attachment to the real estate contract, states,

> No part of the Property shall be used by Grantee [Eastling] or any other Grantee Party for an automobile service station, petroleum station, gasoline station, convenience store, quick-lube facility, or automobile repair shop, or for the purpose of conducting or carrying on the business of selling, offering for sale, storage, handling, distributing, or dealing in petroleum, gasoline, diesel fuel, kerosene, benzol, naphtha, greases, lubricating oils, any fuel used for internal combustion engines, lubricants in any form, automobile parts or accessories, tires, batteries, or other

---

[1]The Honorable Donovan W. Frank, United States District Judge for the District of Minnesota.

[2]According to the deposition testimony of Patrick Saunders, a BP employee, at that time a "BP Connect" was a 4200-square-foot gas station and convenience store, owned and operated by BP, offering made-to-order sandwiches and limited seating.

petroleum or petroleum-related products, except for the personal use or consumption of such products by Grantee or other occupants of the Property. For purposes of this restriction, the term "convenience store" shall mean any retail business with its primary emphasis on providing the public with a convenient location to quickly purchase a wide array of consumable products (predominantly food or food and gasoline) and services.

The above covenants and use restrictions bind and restrict the Property as covenants and restrictions running with the land and are deemed to benefit Grantor [BP] as an owner or lessee of lands in Hennepin County, Minnesota, or as the operator of retail operations in such County. These restrictive covenants will remain in full force and effect for a term of approximately ten (10) years commencing on the Closing Date and terminating on the tenth (10th) anniversary after the Completion Date, . . . whereupon these restrictive covenants will automatically lapse and terminate and be of no further force or effect.

To allow Eastling to continue to operate the gas station as a BP-branded station, the real estate contract further provided,

Purchaser expressly acknowledges and agrees that Seller has entered into this Contract only upon the express understanding that the Property shall (for 10 years, or shorter period if Amoco/BP and its successors and assigns cease to serve the area in which the Property is located), continue to be used following closing as an Amoco/BP (or its successors or assigns)-branded retail gasoline station supplied by Amoco/BP (or its successors or assigns)-branded jobber. Therefore, Seller hereby agrees that the petroleum use restriction set forth in Attachment #2 shall not be enforced by Seller against Purchaser or subsequent owner's [sic] of the Property, and Seller agrees to waive the same, so long as the gasoline station located on the Property continues to be an Amoco/BP (or its successors or assigns)-branded station supplied by Amoco/BP (or its successors or assigns)-branded jobber . . . . If Amoco/BP (or its successors and assigns) cease serving the area within which the Property is located, then Amoco/BP (or its successors

-3-

or assigns) shall execute a recordable release to remove the petroleum use restriction from the Property.

The real estate contract also required Eastling to convert the station to a BP-Connect-style store.[3] Eastling claims that at the time of the sale, BP told him that it was planning to invest heavily in the Minneapolis-St. Paul market and that it planned to convert all of its Twin Cities stations to BP Connect stores. Eastling contends that he agreed to purchase the property and convert the station to a BP-Connect-style store based on BP's representation that it intended to develop BP Connect stores throughout the Twin Cities market.

Finally, the real estate contract required Eastling to enter into a "dealer supply agreement" with BP, which provided that BP would be the exclusive supplier of petroleum products to Eastling's station for ten years, beginning on December 16, 2004. The dealer supply agreement contained an early-termination option allowing Eastling to terminate it by giving BP ninety days' notice, paying all financial obligations then accrued, and paying certain liquidated damages.

After spending nearly three million dollars to purchase the property and rebuild the station, Eastling opened the BP-Connect-style store in 2004. Soon after, he learned that BP had decided to "decapitalize" the Twin Cities market. Between 2005 and 2006, BP sold its interests in all properties it owned in Hennepin County and assigned all of the leases it had in the market to those purchasers. BP did, however, continue to supply petroleum products to its branded stations in the Twin Cities market.

---

[3]Because it was not owned by BP, Eastling's station would not technically qualify as a BP Connect store, but the real estate contract required Eastling to build the station in the same style as a BP Connect.

Eastling filed suit, seeking a declaratory judgment that the Petroleum Restriction was no longer binding. Eastling argued that because BP no longer owned or leased lands or operated retail operations in Hennepin County, it no longer benefitted from the Petroleum Restriction "as an owner or lessee of lands in Hennepin County." Therefore, according to Eastling, the Petroleum Restriction no longer served its original purpose, and circumstances had changed so as to invalidate the Petroleum Restriction. Both parties filed motions for summary judgment. The district court granted BP's motion for summary judgment and dismissed Eastling's motion. The district court found that the language of the real estate contract and Petroleum Restriction was clear and unambiguous and that, "at the time the parties entered into the transaction, they intended that the property . . . would carry a restrictive covenant that it could only be operated as a BP-branded station for ten years, so long as the property was operated as a gas station and BP supplied petroleum products in the area."

The district court rejected Eastling's argument that because of BP's decision to decapitalize the Twin Cities market, circumstances had changed so as to invalidate the Petroleum Restriction. In support, the court relied on *Double Diamond Properties, LLC v. Amoco Oil Co.*, 487 F. Supp. 2d 737 (E.D. Va. 2007), *aff'd*, *Double Diamond Props., LLC v. BP Prods. N. Am., Inc*., 277 Fed. Appx. 312 (4th Cir. 2008). *Double Diamond* also involved a restrictive covenant on a gas station property that prohibited the sale of non-BP petroleum products on the property and BP's decision to decapitalize the Southeastern Virginia market. *Id.* at 740-41. The district court in *Double Diamond* concluded that the purpose of the restrictive covenant was to benefit BP as a refiner and supplier of its branded petroleum and that the restrictive covenant continued to benefit BP even after its decision to decapitalize the Southeastern Virginia market. *Id.* at 746. Eastling attempted to distinguish *Double Diamond* by noting that the restrictive covenant in that case explicitly stated that its purpose was to benefit BP "as an owner or lessee of lands" in the area "or as the operator or supplier of retail operations" in the area, whereas here the Petroleum Restriction stated

-5-

only that it was to benefit BP "as an owner or lessee of lands in Hennepin County, Minnesota, or as the operator of retail operations" in Hennepin County. The district court rejected that argument, citing provisions in both the Petroleum Restriction and the real estate contract and concluding that the parties' agreement reflected a broader purpose of ensuring that so long as BP supplied petroleum products to the area and the property was operated as a gas station, the property would be a BP-branded station. The district court determined that even though BP did not own or lease lands or operate retail operations in Hennepin County, BP still benefitted from the property's status as a BP-branded station. Consequently, the district court granted BP's motion for summary judgment and denied Eastling's motion for summary judgment.

## II. DISCUSSION

We review a district court's decision to grant summary judgment de novo, and we may affirm on any grounds supported by the record. *Am. Home Assur. Co. v. Pope*, 487 F.3d 590, 598 (8th Cir. 2007). A court should grant a motion for summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). We view the evidence in the light most favorable to the nonmoving party. *Am. Home Assur. Co.*, 487 F.3d at 598.

Under Minnesota law, restrictive covenants are strictly construed, but they are enforced to the extent of the "true intent of the parties." *See Naftalin v. John Wood Co.*, 116 N.W.2d 91, 100 (Minn. 1962). Eastling argues that we should read the Petroleum Restriction in isolation and that the district court erred by reading it in conjunction with the real estate contract. According to Eastling, the only benefits the Petroleum Restriction itself conferred on BP were tied to BP's status as an owner or lessee of lands or the operator of retail operations in Hennepin County. Under this theory, if we look to the Petroleum Restriction in isolation, then once BP was no

longer an owner or lessee of lands or the operator of retail operations in Hennepin County, it could no longer benefit from the Petroleum Restriction.  However, "[i]t is an elementary principle of law that a contract must be construed as a whole," and "[t]he intention of the parties must be gathered from the entire instrument and not from isolated clauses."  *Telex Corp. v. Data Prods. Corp.*, 135 N.W.2d 681, 685 (Minn. 1965).  The "Restrictive Covenants," including the Petroleum Restriction, are "annexed" to the real estate contract as part of the second attachment to the contract.  Moreover, the real estate contract specifically refers to and makes the restrictive covenants "part" of the real estate contract. *See, e.g.*, *Katzner v. Kelleher Constr.*, 545 N.W.2d 378, 379-80 (Minn. 1996) (applying, as part of the contract, conditions that were incorporated by reference).  Accordingly, we conclude that the Petroleum Restriction is a part of the real estate contract, which we must read as a whole.  Thus, the district court did not err when it considered the real estate contract and the Petroleum Restriction together.

Eastling next argues that the Petroleum Restriction only identifies a benefit to BP as an owner or lessee of lands or operator of retail operations in Hennepin County. Because BP sold its property, gave up its leases, and no longer operated retail operations in Hennepin County, Eastling argues that BP severed the benefit identified in the Petroleum Restriction from its roles listed in the Petroleum Restriction.  In other words, once BP was no longer an owner or lessee of lands or operator of retail operations in Hennepin County, it could no longer enforce the benefit identified in the Petroleum Restriction.  We disagree.  As the district court explained, the purpose of the Petroleum Restriction is "clear from its language:  to ensure that so long as BP supplies petroleum products to this area, and so long as the property is operated as a gas station, the property will be a BP-branded station."

Eastling asserts that we should reach a contrary conclusion based on *In re Turners Crossroad Development Co.*, 277 N.W.2d 364 (Minn. 1979), but again we disagree.   In *Turners Crossroad*, McCarthy's St. Louis Park Cafe, Inc.

("McCarthy's") conveyed a tract of land ("Tract I") to the Minneapolis Baseball and Athletic Association ("MBAA") with a restriction preventing the sale of food or liquor on the land except for the kinds typically sold in connection with a baseball game. *Id.* at 366-67. McCarthy's owned another tract of land ("Tract II") next to Tract I, on which it operated a restaurant and liquor store. *Id.* at 367. McCarthy's subsequently conveyed all of its assets to McCarthy Enterprises, which then conveyed Tract II to Eddie Webster's, Inc. with a deed that reserved to McCarthy Enterprises the right to enforce the restriction. The MBAA later conveyed Tract I to Turners Crossroad Development Co. ("Turners"). *Id.* at 368. Turners planned to build restaurants and bars on Tract I. *Id.* McCarthy Enterprises attempted to block the proposed development by enforcing the restriction. *Id.* The Minnesota Supreme Court concluded that the purpose of the restriction was to protect McCarthy's restaurant and liquor store from competition. Therefore, the covenant ran with the land and was not a personal benefit to McCarthy Enterprises. *Id.* at 371. Because the restriction ran with the land and benefitted Tract II, McCarthy Enterprises' attempt to reserve the enforcement right to itself after conveying the property to Eddie Webster's was held to have extinguished the restriction. *Id.* at 372.

Eastling argues that *Turners Crossroad* compels us to conclude that BP could no longer enforce the Petroleum Restriction once it severed the benefit, but *Turners Crossroad* is distinguishable. There, the restriction clearly benefitted a neighboring property, since the constraints on the kinds of food and liquor that could be sold on Tract I protected the restaurant on the adjacent Tract II from competition. The restriction did not confer a general benefit on McCarthy's or McCarthy Enterprises as individual entities; rather, it only benefitted them in their capacities as owners of the tract on which the restaurant was located. *See id.* at 372. Here, there is no particular property, such as an adjoining piece of land, that was intended to benefit from the Petroleum Restriction. Unlike *Turners Crossroad*, in which McCarthy Enterprises could no longer benefit once it sold Tract II, BP benefits from the Petroleum Restriction by its continuing presence in the Twin Cities market through

the sales of its petroleum products. Thus, *Turners Crossroad* does not compel us to find that the Petroleum Restriction was extinguished.[4]

Eastling also argues that BP's decapitalization of the Twin Cities market amounts to a change in circumstances such that enforcement of the Petroleum Restriction is unreasonable and that the district court erred by applying the reasoning of *Double Diamond* in analyzing whether circumstances had changed. Minnesota courts have determined that conditions may change to defeat the purpose of a

---

[4]Furthermore, we predict that the Minnesota Supreme Court would apply the principles set forth in the Restatement (Third) of Property: Servitudes, even though the court has not relied on that particular restatement before. *See, e.g.*, *Larson v. Wasemiller*, 738 N.W.2d 300, 306 (Minn. 2007) (noting that the Minnesota Supreme Court has "frequently relied on the Restatement of Torts to guide [its] development of tort law in areas that [it has] not previously had an opportunity to address"); *Turners Crossroad*, 277 N.W.2d at 369-72 (applying the reasoning of the then-current Restatement of Property); *see also Magnuson v. Diekmann*, 689 N.W.2d 272, 274-75 (Minn. Ct. App. 2004) (relying on the Restatement (Third) of Property: Wills and Other Donative Transfers where Minnesota caselaw did not resolve the issue). The Restatement (Third) of Property: Servitudes recognizes the enforceability of a "benefit in gross," which is a benefit "not tied to ownership or occupancy of a particular unit or parcel of land." Restatement (Third) of Prop.: Servitudes § 1.5(2). A benefit is in gross if the parties intend for it to be in gross. *See id.* § 4.1(1). If the intention of the parties is not ascertainable, however, a benefit may still be in gross "if it serves a purpose that would be more useful to the original beneficiary than it would be to a successor to an interest in property held by the original beneficiary at the time the servitude was created." *Id.* § 4.5(1)(b). In our view, the Petroleum Restriction, together with the real estate contract, shows that the parties intended to create a benefit in gross. Assuming, however, that the intention of the parties was not ascertainable, the benefit would still be in gross because the Petroleum Restriction serves a purpose more useful to BP than it would be to a successor to an interest in property held by BP at the time the servitude was created. Thus, under the Restatement (Third) of Property: Servitudes, the Petroleum Restriction created an enforceable benefit in gross, which BP retained when it sold its property, gave up its leases, and no longer operated retail operations in Hennepin County.

restriction on land use. *See Burger v. City of St. Paul*, 64 N.W.2d 73, 81 (Minn. 1954) ("Conditions change from time to time and therefore no hard-and-fast rule can be laid down as to when change in condition will defeat the purpose of the restrictions. It is generally held that the changes must be of such impact as to practically destroy the essential objects and purposes of the restrictive use . . . ."). We find that the decapitalization did not "practically destroy the essential objects and purposes of the" Petroleum Restriction. Reading the real estate contract as a whole, as we must, we agree with the district court that the purpose of the Petroleum Restriction was to ensure that Eastling sold only BP petroleum products at the 600 Boone Avenue North property for at least ten years, and that purpose still exists. As the district court noted, "BP still supplies the Twin Cities market with gasoline and benefits from the Boone Avenue station's status as a BP-branded station."

Eastling further claims that the restrictions imposed by the Petroleum Restriction do not run with the land and so do not bind Eastling's successors. However, as we have already stated, we read the Petroleum Restriction as part of the real estate contract. The Petroleum Restriction explicitly states that "[t]he above covenants and use restrictions bind and restrict the Property as covenants and restrictions running with the land." Accordingly, we reject the premise that the restrictions do not run with the land.[5]

---

[5]Eastling also argues that because the dealer supply agreement allows for the possibility of early termination, BP cannot claim that it benefits from continuing to supply petroleum products at the property, as Eastling can choose to terminate the dealer supply agreement at any time. However, even if Eastling chose to terminate the dealer supply agreement, the Petroleum Restriction would still prohibit Eastling from selling any other petroleum products on the property. Regardless, Eastling failed to make this argument in its opening brief, so it is waived. *See Eckert v. Titan Tire Corp.*, 514 F.3d 801, 805 n.2 (8th Cir. 2008).

-10-

## III.  CONCLUSION

Accordingly, we affirm the district court's grant of summary judgment.

_____